**EXXON CORPORATION, Plaintiff,**

v.

**Manuel LUJAN, Jr., Secretary of the United States Department of Interior; and the United States Department of Interior, Defendants.**

**No. C88–012–K.**

United States District Court,
D. Wyoming.

Feb. 2, 1990.

Marilyn S. Kite and Marcelle Shoop, Cheyenne, Wyo., for plaintiff.

Fred R. Wagner, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

KERR, District Judge.

This appeal[1] stems from the Bureau of Land Management's (BLM) decision to issue a right-of-way to Exxon Corporation for a carbon dioxide pipeline pursuant to section 28 of the Mineral Leasing Act of 1920 (MLA), *as amended,* 30 U.S.C. § 185, rather than Title V of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1761 *et seq.* The significance of this distinction will become readily apparent below. With a final decision from the Secretary of the Interior (Secretary) in the form of a decision of the Interior Board of Land Appeals (IBLA) affirming the BLM's issuance under the MLA having been rendered, the Court has jurisdiction of this appeal pursuant to 5 U.S.C. §§ 702, 704. Venue is proper pursuant to 28 U.S.C. § 1391(e) as the cause of action arose in Wyoming and the lands involved are situated therein. The facts of this case are straightforward and undisputed.

Exxon owns and operates federal oil and gas leases in the LaBarge field in southwestern Wyoming through a network of pipelines across the state. As virtually all of the pipelines cross federal lands, Exxon obtained rights-of-way for them.

The LaBarge project was developed by Exxon to produce, separate, process, and market components of the raw gas stream emerging at the wellhead. The primary producing zones lie between 14,000 and 18,-000 feet below the earth's surface. This project is a large-scale operation involving drilling and field production of gas, well field dehydration, gas collection and conveyance via pipelines, gas processing for the treatment of sour gas, and production of carbon dioxide, elemental sulfur, nitrogen, and helium. These operations are facilitated through product transport systems, access roads, and other structures.

At last report, the gas stream was consisting of 66.5% carbon dioxide, 20.5% methane, 7.4% nitrogen, 4.5% hydrogen sulfide, 0.6% helium, and 0.5% other gases. Raw gas is shipped from the LaBarge field to a dehydration plant and subsequently to a processing plant at Shute Creek, some fifty miles away, where separation of the various gas components for the marketplace occurs. The hydrogen sulfide gas stream is converted into elemental sulfur for environmental reasons. Nitrogen and helium are cryogenically removed to improve methane's heating value. Methane leaves the Shute Creek plant via one pipeline; carbon dioxide leaves by another. The carbon dioxide pipeline eventually connects to two branching pipelines, sending proportionate amounts of the gas to Rangely, Colorado and Bairoil, Wyoming for use in tertiary oil recovery—a relatively new process whereby carbon dioxide is injected into old oil reservoirs, increasing the pressure and flow characteristics of remaining oil, consequently enabling more oil to move toward production wells and eventually to market. The process is a lengthy one involving an alternating cycle of a month of carbon dioxide injection followed by two weeks of water injection.[2] *See* Rangely Carbon Dioxide Pipeline Draft En-

---

1. Subsequent to filing this appeal, Exxon moved to dismiss a portion of its appeal as it related to the issues of feed gas pipeline rights-of-way, a matter which the IBLA consolidated as IBLA 85–458. On April 20, 1989, the Court granted the motion and dismissed that portion of the appeal *without prejudice.*

   Accordingly, that part of the IBLA's decision will not be considered here.

2. Exxon is responsible for the construction and operation of only one segment of the carbon dioxide pipeline, to-wit: from a compressor at the upstream end of the pipeline to a point near Rock Springs, Wyoming. Responsibility for the construction and operation of the remainder of the pipeline rests with Chevron, U.S.A., Inc.; it extends, in three segments, from Rock Springs, Wyoming to the Rangely Weber Sand Unit oil field in Colorado. The BLM issued right-of-way grants to Chevron for all three segments under section 28 of the MLA, grants which Chevron has accepted without appeal. *See* A.R. Tab 17, p. 2.

vironmental Impact Statement, August 1984 (A.R. Tab 38).

Although Exxon applied for a right-of-way for the carbon dioxide pipeline pursuant to the FLPMA, it was granted one under the MLA instead. This action by the BLM imposes upon Exxon a common carrier requirement, thus allowing other companies to utilize the pipeline as well for transporting carbon dioxide. Had the right-of-way issued under the FLPMA, as sought, no such common carrier requirement would have attached.

In order for tertiary recovery operations to be successful, a steady, constant, and uninterrupted supply of carbon dioxide is needed. Exxon urges that requiring it to make its pipeline available for use by others impairs Exxon's ability to guarantee the continuous supply required by its purchasers for successful extraction. This, Exxon argues, jeopardizes an investment of already well over one billion dollars and places it at a competitive disadvantage with those companies who produce carbon dioxide artificially.

Issuance of the right-of-way pursuant to the MLA resulted from an administrative decision equating natural gas with all naturally occurring gas.' Exxon's position, based in part upon an earlier carbon dioxide right-of-way grant to another company under terms of the FLPMA, is that natural gas refers only to hydrocarbons; that is, gases whose composition is solely carbon and hydrogen. Since carbon dioxide contains oxygen, it is not classified as a hydrocarbon. This, it is argued, coupled with the earlier grant pursuant to the FLPMA, supports consideration of carbon dioxide right-of-way requests under the FLPMA rather than the MLA which applies to pipeline rights-of-way for natural gas. The IBLA disagreed. Thus, the ultimate issue before the Court is purely one of law, that being whether section 28 of the MLA is the correct authority for issuance of pipeline rights-of-way for the transportation of carbon dioxide across federal lands. Resolution of this issue necessitates a determination of whether the term "natural gas," as contained in the MLA for purposes of

right-of-way grants, is confined solely to gaseous hydrocarbons whose chief component gas is methane, or whether its reach is broader, encompassing all naturally occurring gases, including carbon dioxide, which emerge at the wellhead.

■ Under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, the scope of judicial review of final agency action is a deferential one whereby a reviewing court can set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A) (1988). *See also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) and *Edwards v. Califano*, 619 F.2d 865 (10th Cir.1980). This narrow standard of review requires that the Court ascertain whether the agency based its decision on relevant factors or whether it made a clear error of judgment. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975).

A reviewing court may also set aside an agency decision it finds to be unsupported by substantial evidence in the record. 5 U.S.C. § 706(2)(E) (1988). Substantial evidence means " 'more than a mere scintilla' "; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). While it is permissible for a court to engage in substantial inquiry into the facts, absent clear error, it must be wary to substitute its judgment for that of an expert agency. *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 238 (8th Cir. 1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). *See also FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) and *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (10th Cir.1986).

Section 28 of the MLA, *as amended*, 30 U.S.C. § 185, provides in relevant part as follows:

(a) Rights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom to any applicant possessing the qualifications provided in section 181 of this title in accordance with the provisions of this section.

. . . .

(r)(1) Pipelines and related facilities authorized under this section shall be constructed, operated, and maintained as common carriers.

(2)(A) The owners or operators of pipelines subject to this section shall accept, convey, transport, or purchase without discrimination all oil or gas delivered to the pipeline without regard to whether such oil or gas was produced on Federal or non-Federal lands.

30 U.S.C. §§ 185(a), (r)(1), (r)(2)(A).

Other pipeline rights-of-way are governed by section 501 of the FLPMA, *as amended*, 43 U.S.C. § 1761 which, in material part, says:

(a) The Secretary [of the Interior], with respect to the public lands and, the Secretary of Agriculture, with respect to lands within the National Forest System (except in each case land designated as wilderness), are authorized to grant, issue, or renew rights-of-way over, upon, under, or through such lands for

. . . .

(2) pipelines and other systems for the transportation or distribution of liquids and gases, other than water and other than oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom, and for storage and terminal facilities in connection therewith; [or]

. . . .

(7) such other necessary transportation or other systems or facilities which are in the public interest and which require rights-of-way over, upon, under, or through such lands.

43 U.S.C. §§ 1761(a)(2), (7).

Interior's position throughout this litigation has been that "natural gas" as used in these statutes refers to naturally occurring gas, the modifier having been inserted 'to differentiate this category of gases from those gases which are artificially produced. However, the department's regulations implementing section 28 contain no definition of natural gas, instead defining "oil or gas" as "oil, natural gas, synthetic liquid or gaseous fuels, or any refined product produced therefrom." 43 C.F.R. § 2880.0–5(g) (1988). Exxon treats "natural gas" as a well-defined subset of the state of matter generically termed as "gases," consisting only of the paraffin series of hydrocarbons, to-wit: methane, ethane, and the propane and butane families. In so doing, Exxon ignores the other gases, such as carbon dioxide, which are commonly found interspersed with these low molecular weight hydrocarbons.

A preliminary look to other sources for the definition of natural gas provides some insight into the problem. According to Webster's Unabridged Third New International Dictionary 1507 (1981), natural gas is

gas issuing from the earth's crust through natural openings or bored wells; *esp:* any of various combustible gaseous mixtures that when in the dry state contain largely methane and in the wet state in association with petroleum contain also higher hydrocarbons (as ethane, propane, butanes, and pentanes) and that are used chiefly as fuels directly or by recovery of gasoline or conversion to other liquid fuels and as raw materials for the manufacture of carbon black and many other products (as nitroparaffins and synthesis gas)[.]

As for one encyclopedia:

Natural gas is a hydrocarbon mixture consisting primarily of methane and ethane, both of which are gaseous under atmospheric conditions. The mixture also may contain other hydrocarbons, such as propane, butane, pentane, and hexane . . .

Other gases that commonly occur in association with the hydrocarbon gases are nitrogen, carbon dioxide, hydrogen, hydrogen sulfide, and such noble gases as helium and argon.

19 Encyclopaedia Britannica (Macropaedia) 595–596 (15th ed. 1988).

An Interior Department dictionary describes natural gas as

[a] mixture of the low molecular weight paraffin series hydrocarbons methane, ethane, propane, and butane with small amounts of higher hydrocarbons, also frequently containing small or large proportions of nitrogen, carbon dioxide, hydrogen sulfide and occasionally small proportions of helium. Methane is almost always the major constituent. Natural gas accompanying petroleum always contains appreciable quantities of ethane, propane, butane, as well as some pentane and hexane vapors and is known as wet gas. Dry gas contains little of these higher hydrocarbons. The exact composition of natural gas varies with locality ... Natural gas is used directly as a fuel and the higher hydrocarbons in it are also recovered for blending in motor fuel, and for use as liquefied gases.

U.S. Department of the Interior, Bureau of Mines, A Dictionary of Mining, Mineral, and Related Terms 741 (1968).

Scientific publications differ in their characterization of natural gas as well. The American Gas Association defines natural gas as "[a] naturally occurring mixture of hydrocarbon and nonhydrocarbon gases found in porous geologic formations beneath the earth's surface, often in association with petroleum." 3 Regulation of the Gas Industry, at GL–64 (American Gas Association ed. 1988). One treatise describes the term thus:

Natural gas contains only the lightest and most volatile of the hydrocarbons. It consists chiefly of the lower members of the paraffin series, especially marsh gas, or methane ... Ethane ... is present in considerable quantities in the natural gas from some regions. In association with these hydrocarbons there may be varying quantities of carbon dioxide ..., carbon monoxide ..., hydrogen sulphide ..., hydrogen, oxygen and nitrogen.

....

The gas is colorless, practically odorless, and burns with a luminous flame. When mixed with air it is highly explosive.

In heating value, natural gas varies considerably, depending on the chemical character and proportion of its combustible hydrocarbons and the relative quantities which are present of such incombustible impurities as nitrogen ... Natural gas has a much higher heating value than manufactured gases....

1 E. Kuntz, Oil and Gas §§ 1.18 and 1.19, at 34, 35 (1987).

Another treatise counters that natural gas consists of "[h]ydrocarbons which at atmospheric conditions of temperature and pressure are in a gaseous phase." 8 H. Williams & C. Meyers, Oil and Gas Law 588 (1987).

One commentator offers an explanation for this seeming discrepancy:

The ordinary rarefied or gaseous hydrocarbons found in the earth are referred to generally as 'natural gas.' Noncombustible gases occurring in the earth, such as carbon dioxide, hydrogen sulphide, helium, and nitrogen, are generally referred to by their proper chemical names. Often, however, noncombustible gases are found in combination with combustible gases, and the mixture is referred to generally as 'natural gas,' without any attempt to distinguish between the combustible and noncombustible gases.

Pruitt, *Mineral Terms—Some Problems in Their Use and Definition*, 11 Rocky Mtn.Min.L.Inst. 16 (1966).

Application of the plain meaning rule of statutory construction would be fruitless in the face of this ambiguity. To average lay persons, natural gas is synonymous with the fuel they use to heat their homes or run their machinery. Students of physics and chemistry in universities across the country are taught to equate natural gas with hydrocarbons such as methane and

propane. However, hydrocarbons rarely occur in pure form. Rather, when they reach the earth's surface, various other gases such as hydrogen sulfide, carbon dioxide, nitrogen, helium, and argon are commingled with the gaseous hydrocarbons. Collectively calling these gases "natural," as many do, in the sense that they occur naturally as opposed to being products of a manufacturing process, is not unreasonable.

Separation of the nonhydrocarbon gases such as carbon dioxide from the hydrocarbons increases the fuel value of natural gas. If the producing field contains only small amounts of nonhydrocarbons in association with the hydrocarbons, the heating value of the latter will not be greatly impaired by the presence of such gases as carbon dioxide.

With no statutory definition of natural gas contained in the MLA, the term is inescapably ambiguous requiring review of the legislative history in an attempt to discern congressional intent. *See Solis–Ramirez v. United States Department of Justice,* 758 F.2d 1426, 1430 (11th Cir.1985). In a 1935 amendment to the MLA which principally dealt with introducing so-called "prospecting leases" to replace an unsuccessful permitting system for the leasing and development of oil lands, minor revisions of section 28 were considered and favorably approved by the Senate Committee on Public Lands and Surveys. In a committee report submitted by Senator O'Mahoney of Wyoming is found the following statement regarding rights-of-way:

> The measure also requires that grants of rights-of-way on the public domain for pipe-line purposes shall be conditioned upon an agreement to accept, convey, transport, or purchase without discrimination, oil or *gas* produced from Government lands in the vicinity.

79 Cong.Rec. 12076 (1935) (emphasis added). Although the bill went to a conference committee due to disagreement over royalties, section 28 was left undisturbed. *Id.* at 13255. It was signed into law by the President on August 21, 1935, *id.* at 14690, with section 28 appearing as follows:

> That rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the Interior for pipe-line purposes for the transportation of oil or natural gas ... upon the express condition that such pipe lines shall be constructed, operated, and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or *natural gas* produced from Government lands in the vicinity of the pipe line in such proportionate amounts as the Secretary of the Interior may ... determine to be reasonable....

Ch. 599, § 28, 49 Stat. 674, 678–79 (1935) (emphasis added).

With the passage of the Natural Gas Act (NGA) in 1935, the Federal Power Commission (FPC) (now Federal Energy Regulatory Commission or FERC) acquired jurisdiction over natural gas pipelines. Problems with dual administration of natural gas pipelines by both the Department of Interior and the FPC prompted Senator Butler of Nebraska to introduce in 1953 a bill to amend section 28 so as to exempt from common carrier requirements those natural gas pipelines already regulated under the NGA. Again, in Senator Butler's statement in support of his bill, the terms "gas" and "natural gas" appear to be used interchangeably with reference to the pipelines, suggesting some synonymity:

> In 1920 when the Mineral Leasing Act of February 25, 1920, was enacted, the Federal Government had not yet asserted broad jurisdiction over the operations of gas pipelines. For that reason, a provision was inserted in that act requiring that *all oil or gas* pipelines crossing public lands be common carriers. That provision was the first major step taken by the Federal Government toward the regulation of gas pipelines.
>
> Subsequently ... Congress passed the Natural Gas Act, vesting broad jurisdiction over *natural gas* pipelines in the Federal Power Commission. As a result, we now have these two agencies both

exercising control over the *same* pipelines....

99 Cong.Rec. 9041 (1953) (emphasis added).

An attempt in the House of Representatives to alter the Senate version to, in the sponsoring congressman's view, ensure that producers of natural gas on public lands will still have a common carrier obligation which would protect small independent producers, failed to win approval. *Id.* at 9970–9971. In the end, the Senate version became law. *Id.* at 11102.

Then, in 1973, came a major revision of section 28, primarily in response to energy shortages created by the Arab oil embargo and the country's devastating balance of payments. Debates centered around the need for greater self-sufficiency and less dependence upon foreign sources. There was disagreement as to how best to accomplish these goals. Much of the debates addressed the advantages and disadvantages of the alternatives—a trans-Alaska pipeline, a trans-Canada pipeline, or a Northwest Passage pipeline. *See* 119 Cong.Rec. 22795–22810; 22813–22840; 22978–23002; 23003–23019; 23312–23356; 23543–23565; 23565–23621; 23746–23765; 23765–23777; 23778–23783; 23858–23860; 23861–23862; 23863–23864; 23873–23894; 23909–23910; 24076–24082; 24083–24129; and 24294–24325.

This legislation was regarded as urgent insofar as rights-of-way across federal lands in view of the District of Columbia Circuit's decision in *Wilderness Society v. Morton,* 479 F.2d 842, 848 (D.C.Cir.1973), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), otherwise known as the trans-Alaska pipeline case, that the Secretary of Interior lacked the authority to issue special land use permits expanding the confines within which construction of pipelines across federal lands must take place. The Senate interpreted this decision as proscribing the Secretary from granting rights-of-way across federal lands for the construction of oil and gas pipelines. *See* 119 Cong.Rec. 22795. Viewing this ruling as potentially enveloping all rights-of-way which contain statutory width limitations,

the legislative branch was determined to respond quickly amidst an ever-worsening energy shortage.

Admittedly, this legislation, coming as it did at a time when motorists across the nation were forming long lines at local service stations to get all the gasoline they could as rationing became a household word again and when families were wondering whether they would have enough fuel for heating their homes and cooking meals, supports the position advanced by Exxon here that congressional concern over natural gas supplies was from the standpoint of providing energy and that, therefore, to ascribe to natural gas any meaning other than gaseous hydrocarbons, principally methane, would obscure reality. At the same time, however, congressional emphasis on a national crisis does not ipso facto support the restrictive meaning Exxon would urge. After all, it was certainly widely known at the time that nonhydrocarbon gases are often intermingled with the hydrocarbons.

One of the exhibits read into the record during the debates on the 1973 revisions was a staff report from a FPC study of natural gas reserves. *See* 119 Cong.Rec. 24117–24118. The study was undertaken with the express purpose of "providing for the ultimate consumer an adequate and reliable supply of natural gas at a reasonable price and the Nation a vital energy base...." *Id.* at 24117. One portion of that report is particularly significant:

In making estimates of natural gas reserves the field teams used the definitions cited in the Reserves Estimation Manual (Appendix IV). They are as follows:

The reserves ... are natural gas ... reserves estimated to be recoverable from proved reservoirs under the economic and operating conditions existing at the time of the estimate ... *These reserves estimates ... include gas ... reserves of all types regardless of size, availability of market, ultimate disposition or use.*

*Id.* at 24118 (emphasis added).[3]

The final version which emerged from the conference committee remains substantially unaltered today. In a joint statement, the conference committee gave an explanation of the final right-of-way amendment:

The language agreed upon by the Conference Committee differs from the bill enacted by the Senate and the amendment enacted by the House in the following respects:

1. The Senate bill enacted a completely new system for granting rights-of-way across Federal lands. It applied to rights-of-way for many different purposes.

*The House amendment applied only to rights-of-way for oil and gas pipelines.* It took the form of an amendment to section 28 of the Mineral Leasing Act of 1920, which is the principal authority for granting oil and gas pipeline rights-of-way across public lands.

*The Conferees adopted the House approach, but expanded it to include pipelines for oil, gas, synthetic liquid or gaseous fuels and refined products therefrom* in anticipation of developments in coal gasification and liquefaction, oil shale, and tar sands....

119 Cong.Rec. 35542, 36247 (emphasis added). Here again, the conferees appear to equate "gas" and "natural gas."

A somewhat more revealing reason for insertion of the word "natural" in front of "gas" into section 28 appears to surface from congressional debates over a predecessor statute to the MLA. *Cf. Israel–British Bank (London) Ltd. v. FDIC (In the Matter of Israel–British Bank (London) Ltd.),* 536 F.2d 509, 512 (2nd Cir.1976), *cert. denied,* 429 U.S. 978, 97 S.Ct. 487, 50 L.Ed.2d 585 (1976) (in interpreting statutory language, the court may give particular reference to language used in earlier statutes). The Act of July 17, 1914, 30 U.S.C. §§ 121–123, 38 Stat. 509, opened to agricultural entry lands previously with-

drawn, classified, or reported to be valuable for phosphate, nitrate, potash, oil, gas, or asphaltic minerals. The mineral deposits on these lands, reserved to the United States, continued to be open to discovery and location under the mining laws until the enactment of the MLA. Debates on amendments disclose this colloquy, regarded by the IBLA as compelling, between the bill's sponsor, Representative Ferris, and another congressman pertaining to pipeline rights-of-way:

Mr. MANN. I should like to ask one more question. You do not limit what pipe lines are to carry?

Mr. FERRIS. I do not quite get the gentleman's question.

Mr. MANN. You say 'for all pipe-line purposes.' That includes not only oil, but water, and not only natural gas, but artificial gas. Is it not desirable to limit this permission to oil and natural-gas pipe lines?

Mr. FERRIS. The committee did not intend to do any more than that. Nothing more than that was considered.

Mr. MANN. I will offer an amendment to insert, after the words 'pipe-line purposes,' the words 'for the transportation of oil and natural gas.'

Mr. FERRIS. The committee did not intend to go any further.

51 Cong.Rec. 15419 (1914). Congressman Mann's amendment passed. *Id.* at 15421.

Substantial weight must be given to the intent revealed through this exchange, expressed as it is by the bill's sponsor. Exxon's attempts at minimizing the significance of the distinction representative Mann sought to draw, a distinction which the bill's sponsor affirmed, disregards the fundamental rule of statutory construction which counsels that words in a statute are to be interpreted consistent with the legislative purpose behind the bill. *See Quarles v. St. Clair,* 711 F.2d 691, 704 (5th Cir. 1983). Oftentimes, invocation of this rule will mean giving words a broad, rather than restricted, reading. *United States v.*

---

**3.** *But see* Reed, *The New Carbon Dioxide Pipelines: Revival of the Common Carrier at Common Law,* 12 Okla.City U.L.Rev. 103, 107 (1987).

*Conlon,* 628 F.2d 150, 154 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982). *See also Securities and Exchange Commission v. Holschuh,* 694 F.2d 130, 138 (7th Cir.1982).

The purpose of section 28 was to provide a means by which oil and gas lessees could transport and market the products of their operations. Use of carbon dioxide in enhanced oil recovery operations has resulted in greater profits to oil companies by enabling more oil and gas to reach the ultimate consumer. Implementation of the common carrier requirement minimizes additional miles of pipelines across scenic landscapes and protects small independent producers who might otherwise be disadvantaged.

From the Mann–Ferris dialogue, it is plainly evident that one of these products, natural gas, is not confined to gaseous hydrocarbons alone but rather extends to all the gases that reach the wellhead.[4] Conceptually, this is a viable interpretation in the sense that if one were to categorize gases in the broadest possible manner, they would fall into two categories—natural gas; that is, gases that occur naturally, or artificial gas; namely, gases manufactured in the laboratory.

At the time of the debates on the 1973 amendments, the value of carbon dioxide for use in tertiary recovery operations was well known. Alaska's Pipeline Coordinating Committee, in a review of the merits of the then proposed trans-Alaska pipeline over a trans-Canada pipeline, entered the following report, reprinted in the legislative record upon request of Senator Jackson, the sponsor of the 1973 bill:

> [C]onstruction of a Trans–Alaska pipeline can be started within 90 days of a go-ahead, and it will be completed three years after that. If allowed to proceed in the near future, the Trans–Alaska pipeline can be moving oil to the West Coast by 1977. *Current plans calls [sic] for natural gas at Prudhoe Bay to be reinjected during the first years of production in order to insure more efficient oil recovery.*

119 Cong.Rec. 22804 (emphasis added).

Moreover, Congress knew of the term "hydrocarbon" when section 28 came into being and, in fact, utilized it in other sections of the MLA. In § 181, oil is defined as embracing certain "nongaseous hydrocarbon substances." *See also* 30 U.S.C. § 184(k). In the 1973 debates, the need for development of domestic conventional hydrocarbon sources as well as substitutes for hydrocarbons such as nuclear power was voiced. *See* 119 Cong.Rec. 23578. Had Congress wanted "natural gas" to be interpreted restrictively, it could have either defined the term so as to include only gaseous hydrocarbons, amended § 185 to exclude gases such as carbon dioxide which are part of the gas stream, or simply replaced the term "natural gas" altogether with "hydrocarbons." Whether any of these alternatives were considered is unclear from the legislative records.

Regulations implementing the MLA are of no assistance in this regard. However, a reading of the some seventeen places in the Code of Federal Regulations where the meaning of natural gas is given reveals that the Secretary's interpretation of natural gas, as represented by the IBLA decision, is not an unreasonable one. For example, in the context of oil and gas leases on Osage Reservation lands, the Interior Department's Bureau of Indian Affairs provides this definition:

> 'Natural gas' means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and/or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

25 C.F.R. § 226.1(j) (1989).

Although not binding here, the Environmental Protection Agency defines natural gas for purposes of onshore processing:

---

**4.** That Congress was aware of the difference between "natural" and "artificial" gas in 1914 is certain given that the distinction between the two appears to have had its genesis in 1906 with the Hepburn Act, ch. 3591, 34 Stat. 584, which amended the Interstate Commerce Act of 1887, ch. 104, 24 Stat. 379. *See* 40 Cong.Rec. 6361–6373 (1906).

**1544**

'Natural gas' means a naturally occurring mixture of hydrocarbon and nonhydrocarbon gases found in geologic formations beneath the earth's surface. The principal hydrocarbon constituent is methane.

40 C.F.R. § 60.641 (1988).

Exxon urges less deference to the Interior Department's interpretation of "natural gas" in light of the FERC's decision in *Cortez Pipeline Co.*, 7 FERC ¶ 61,024 (April 6, 1979) and especially in view of a 1977 regional solicitor's opinion concluding that carbon dioxide is not "natural gas" under the MLA and that carbon dioxide pipelines should be regulated under the FLPMA. Both suggestions are unpersuasive.

In *Cortez*, the issue was whether production from certain underground reservoirs which yielded a stream that was 98 percent pure carbon dioxide, the remainder including traces of methane, constituted "natural gas" within the meaning of the Natural Gas Act (NGA), 15 U.S.C. § 717 *et seq.* Referring to the purpose of the NGA, that being to regulate the natural gas industry so as to protect the public from excessive prices, the FERC found that the production was not "natural gas." Also influential in the FERC's decision was the actual chemical composition of the production.

The decision in *Cortez* was not based on the MLA or the FLPMA but was solely confined to the purpose behind the NGA. The MLA, on the other hand, was enacted for very different reasons. Its common carrier requirements are directed not at marketplace regulation but at providing other producers with access across federal lands to transport their products to the marketplace.

As for the 1977 regional solicitor's opinion from Salt Lake City, which recommended that carbon dioxide pipelines be governed by the FLPMA, that recommendation came, to use the regional solicitor's

own words, "in the manner of concluding about such uncertainties...." Exh. B to Exxon's Brief. During consideration of Exxon's right-of-way application, the BLM requested a legal opinion from the Solicitor's office as to the correct legal authority for issuance of a right-of-way. On July 20, 1984, the Associate Solicitor issued a detailed opinion, expressly overruling the 1977 regional solicitor's opinion because it failed to consider the impact of *Northern Natural Gas Co. v. Grounds*, 292 F.Supp. 619 (D.Kan.1968), *rev'd in part on other grounds*, 441 F.2d 704 (10th Cir.1971), *cert. denied*, 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971), *reh'g denied*, 404 U.S. 1065, 92 S.Ct. 732, 30 L.Ed.2d 754 (1972). A.R. Tab 15. The district court in *Northern Natural Gas* used the term "natural gas" to mean the gas which emerges at the wellhead, regardless of composition. *Id.* at 624 n. 2. Further, the 1977 opinion preceded a Solicitor's opinion which concluded that the MLA's reference to "gas" or "natural gas" without any qualifying adjectives supported giving those terms a broad meaning. Solicitor's Opinion, *Ownership of and Right to Extract Coalbed Gas in Federal Coal Deposits*, 88 I.D. 538 (1981). The Associate Solicitor thus concluded that rights-of-way for carbon dioxide pipelines, either from the wellhead or from the processing plant, are governed by section 28 of the MLA, not section 501 of the FLPMA.

The legislative history discussed above convinces the Court that "natural gas," as used in the MLA, has a technical meaning, thus precluding reliance on its ordinary definition.[5] All gases emerging at the wellhead come within its scope. Therefore, the MLA, not the FLPMA, is the appropriate authority for issuance of rights-of-way for carbon dioxide pipelines from the wellhead.

This leaves the question of whether the MLA and its common carrier requirement apply to a pipeline carrying carbon dioxide from the processing plant to the site where

5. Recently, the Wyoming Supreme Court held that for purposes of the state severance tax statute, "natural gas" encompasses all naturally occurring gases produced from drilled wells, including hydrocarbons and nonhydrocarbons such as carbon dioxide. *Amoco Production Co.* *v. State*, 751 P.2d 379 (Wyo.1988). Interestingly, as brought out in that decision, Exxon's LaBarge Project manager, in testimony before the Wyoming Industrial Siting Council, stated that "[n]atural gas is any gas that's naturally produced from a well." *Id.* at 383.

reinjection will occur. The Secretary's position is that, once separated from the gas stream, the carbon dioxide is a "refined product" of natural gas as that term is used in § 185 and, therefore, is still subject to the provisions of the MLA rather than the FLPMA when application for a pipeline right-of-way is made. This, the IBLA concluded after citing to the Interior Department's technical definition of "refine" as meaning " 'to free from impurities.' " *Exxon Corp.*, 97 IBLA at 62 (quoting Bureau of Mines, U.S. Department of the Interior, A Dictionary of Mining, Mineral, and Related Terms 907 (1968)). Exxon urges a narrower interpretation, arguing that a "refined product" does not refer to the product of the process used to separate out gases from the natural gas stream.

Exxon points to the following Interior Department regulatory right-of-way language implementing the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331 *et seq.*, which it maintains is proof positive that the Secretary does not recognize carbon dioxide separated from a sour gas stream as a "refined product": "Gas plant products shall include ... Other Natural Gas Plant Products meeting refined product standards (i.e., gasoline, kerosene, distillate, etc.)." 30 C.F.R. § 256.40(1)(3)(ii)(G) (1989). This definition does not carry the persuasive force which Exxon would impart to it. The use of the word "includes" rather than "means" in a definition indicates that what follows is a nonexclusive list which may be enlarged upon. The absence of carbon dioxide from this list is not conclusive.[6] *Accord Puerto Rico Maritime Shipping Authority v. Interstate Commerce Commission*, 645 F.2d 1102, 1112 n. 26 (D.C.Cir.1981); *Highway & City Freight Drivers, Dockmen and Helpers, Local Union No. 600 v. Gordon Transports, Inc.*, 576 F.2d 1285, 1289 (8th Cir.1978), *cert. denied*, 439 U.S. 1002, 99

S.Ct. 612, 58 L.Ed.2d 678 (1978); and *United States v. City of New York*, 481 F.Supp. 4, 6 (S.D.N.Y.1979), *aff'd mem.*, 614 F.2d 1292 (2nd Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980). As with the term "natural gas," a "refined product," as used in § 185, should also be given a broad interpretation so as to apply to carbon dioxide which is separated from the natural gas stream. Having said this, the MLA remains the appropriate authority for granting rights-of-way for pipelines carrying carbon dioxide from a processing plant to other points.

In sum, the Court finds that the Secretary's decision as appealed was not arbitrary and capricious. The distinction Congress sought to create with the addition of the word "natural" to modify gas was to exclude from the operation of the MLA gas that is artificially produced. As part of the natural gas stream emerging at the wellhead, carbon dioxide is included in the term "natural gas" under § 185. After its separation from the stream, it acquires an independent existence as a "refined product" of natural gas.

For the reasons stated above, the Court holds that the proper issuing authority for pipeline rights-of-way for the transportation of carbon dioxide across federal lands, both from the wellhead as part of the natural gas stream to processing facilities and from those facilities to other points, is the MLA rather than the FLPMA. Accordingly, the common carrier provisions attach.[7]

An Order affirming the decision of the Interior Board of Land Appeals will be entered in accordance with this Memorandum Opinion.

**6.** Since Exxon chooses to rely upon regulations implementing the OCSLA, it is worthwhile to note that in the same section is found the following definition of natural gas:

'Natural gas' means a *mixture of hydrocarbons and varying quantities of nonhydrocarbons* that exist in the gaseous phase.

30 C.F.R. § 256.40(h) (emphasis added).

**7.** Any competitive concerns Exxon has regarding its duties under the common carrier provision of the MLA pale in view of a stipulation entered into between Exxon and the Interior Department whereby Exxon will not be required to carry the carbon dioxide offered by other producers if no excess capacity exists and no reduction in production need be implemented. *See* A.R. Tab 48.