**EXXON CORPORATION,
Plaintiff–Appellant,**

v.

**Manuel LUJAN, Secretary of the United States Department of Interior, and the United States Department of Interior, Defendants–Appellees.**

**No. 90–8036.**

United States Court of Appeals,
Tenth Circuit.

July 23, 1992.

---

Marcelle Shoop of Holland & Hart, Cheyenne, Wyo. (Marilyn S. Kite of Holland & Hart, Cheyenne, Wyo., Quinn O'Connell of Holland & Hart, Washington, D.C., and James R. Stevens, Jr. of Exxon Corp., Houston, Tex., with her on the briefs), for plaintiff-appellant.

William B. Lazarus, Atty., Dept. of Justice, Environment and Natural Resources Div., Washington, D.C. (Barry M. Hartman, Acting Asst. Atty. Gen., Richard A. Stacy, U.S. Atty., and Carol A. Statkus, Asst. U.S. Atty., Cheyenne, Wyo., Fred R. Wagner and Robert L. Klarquist, Attys., Dept. of Justice, Environment and Natural Resources Div., Washington, D.C., and appearing of counsel Kristina A. Clark and Mark Etchart, Attys., U.S. Dept. of Interior, Washington, D.C., with him on the brief), for defendants-appellees.

Before SEYMOUR, HOLLOWAY, and BARRETT, Circuit Judges.

SEYMOUR, Circuit Judge.

In this appeal from a district court order affirming the decision of the Bureau of Land Management (BLM), Exxon Corporation challenges the Secretary of Interior's decision to issue a right-of-way across federal land in Wyoming for Exxon's carbon dioxide pipeline pursuant to section 28 of the Mineral Leasing Act (MLA), 30 U.S.C. § 185 (1988). Exxon argues that the right-of-way should properly have been issued under the auspices of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1761(a)(2) (1988). The district court held that the agency's decision to issue the permit under the MLA was reasonable, and therefore affirmed the decision of the BLM. *See Exxon Corp. v. Lujan,* 730 F.Supp. 1535 (D.Wyo.1990). Albeit for slightly different reasons, we affirm the decision below.

The relevant factual background is simply stated. Exxon operates several oil and gas leases on federal lands in the LaBarge field in southwestern Wyoming. The gas stream produced from that field includes carbon dioxide, methane, nitrogen, helium,

and hydrogen sulfide. Exxon ships the raw gas from the LaBarge field to a processing plant at Shute Creek, where the gas is separated into its constituent elements which are marketed individually. The carbon dioxide travels by pipeline network to Rangely, Colorado, and Bairoil, Wyoming, where it is employed in tertiary oil recovery operations.[1]

In these operations, an oil company injects carbon dioxide into an oil field in order to maximize its productive capacity. The mechanics of tertiary oil recovery have little impact on our analysis of the BLM's decision. The process itself matters only because it creates commercial demand for Exxon's carbon dioxide. The FLPMA and the MLA impose different obligations on parties holding rights-of-way under their authority. The MLA's provisions impose a common carrier requirement; FLPMA does not. The Exxon right-of-way was issued pursuant to the MLA. Exxon argued in district court and repeats on appeal that the common carrier requirement threatens its ability to fulfill its commercial contracts for carbon dioxide delivery. Rec., vol. I, doc. 37 at 15–16.

Following the agency's decision to issue the right-of-way under section 28 of the MLA, Exxon sought agency review. The Interior Board of Land Appeals upheld the initial agency decision. *Exxon Corp.,* 97 IBLA 45 (April 23, 1987). The district court upheld the decision of the IBLA. Against this background, Exxon brings this appeal, urging that the FLPMA, and not the MLA, should govern rights-of-way for carbon dioxide pipelines.

The district court's opinion rests on its resolution of a purely legal question. As a consequence, we apply a de novo standard of review. *Anthony v. Baker,* 955 F.2d 1395, 1397 (10th Cir.1992). When faced with an agency interpretation of its governing statute, our inquiry is governed by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*See Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 964–65, 108 L.Ed.2d 72 (1990); *Aulston v. United States,* 915 F.2d 584, 588–89 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991). This case involves two statutes, both of which the Secretary is charged with administering, and we must decide whether the agency's construction of the governing statutes is sustainable.

The statutes contain complementary provisions for rights-of-way across federal lands. The MLA provides, in relevant part, that:

> Rights-of-way through any Federal lands may be granted by the Secretary of the Interior or appropriate agency head for pipeline purposes *for the transportation of oil, natural gas, synthetic liquid or gaseous fuels, or any refined product*

---

**1.** Exxon is responsible for only one portion of the pipeline—extending from the processing plant to Rock Springs, Wyoming. The other segments of the pipeline are the responsibility of Chevron Corporation. The required rights-of-way for the other portions of the pipeline were also issued pursuant to section 28 of the MLA. Chevron did not appeal the decision to issue the rights-of-way under that statute. Rec., vol. II, doc. 17 at 2.

*produced therefrom* to any appli-
cant. . . .

30 U.S.C. § 185(a) (emphasis added). The
FLPMA authorizes the Secretary to grant
rights-of-way for:

pipelines and other systems for the
transportation or distribution of liquids
and gases, other than water and *other
than oil, natural gas, synthetic liquid
or gaseous fuels, or any refined prod-
uct produced therefrom,* and for storage
and terminal facilities in connection
therewith.

43 U.S.C. § 1761(a)(2) (emphasis added). In
this case, the sole question is whether car-
bon dioxide is "natural gas" within the
meaning of the two statutes so as to fall
under the MLA and outside the scope of
the FLPMA.[2]

We must first determine whether Con-
gress has addressed the question. Exxon
contends that "natural gas" plainly does
not mean carbon dioxide. If that were the
case, the inquiry would extend no farther.
The plain meaning would amount to Con-
gress's resolution of the question at issue
and the agency, like this court, would have
to abide by that resolution. *Chevron;* 467
U.S. at 842, 104 S.Ct. at 2781. Exxon
suggests that "natural gas" necessarily im-
plies fuel, and that since carbon dioxide is
not fuel it cannot be natural gas. In re-
sponse, the Secretary argues that "natural
gas" refers not to that with which many of
us heat our homes, but to gas that occurs
naturally. Under this construction of the
operative terms, carbon dioxide is "natural
gas" because it is part of the gas stream at
the LaBarge field. After careful consider-
ation, we conclude that the term 'natural
gas' is ambiguous.

As this court has noted before, "[t]he
term 'natural gas' ... has various defini-
tions within the industry." *Aulston,* 915
F.2d at 589 n. 6. Several examples illus-
trate the problematic nature of the termi-
nology chosen by Congress. A dictionary
defines "natural gas" in the following man-

ner: "Natural gas: gas issuing from the
earth's crust through natural openings or
bored wells; *esp:* any of various combusti-
ble gaseous mixtures." Webster's Third
New International Dictionary (1976). A
technical publication sets forth the follow-
ing definition: "Natural gas is defined as a
naturally occurring mixture of hydrocarbon
and nonhydrocarbon gases found in the
porous geologic formations beneath the
earth's surface, often in association with
petroleum." 11 Kirk–Othmer Encyclopedia
of Chemical Technology 630 (3d ed. 1980)
(quoted in *Amoco Prod. Co. v. State,* 751
P.2d 379, 383 (Wyo.1988)). Finally a trea-
tise notes that: "Natural gas contains only
the lightest and most volatile of the hydro-
carbons. . . . In association with these hy-
drocarbons there may be varying quantities
of carbon dioxide ($CO_2$), carbon monoxide
(CO), hydrogen sulphide ($H_2S$), hydrogen,
oxygen and nitrogen." 1 E. Kuntz, Oil and
Gas § 1.18 (1987). Thus, while Exxon's
definition accords more readily with every-
day notions of "natural gas," these notions
do not, without more, resolve the definition-
al quandary.

In addition to the district court and the
IBLA in this case, other adjudicatory bod-
ies have recognized the difficulty of assign-
ing a definition to "natural gas."

At the outset it should be noted that the
term "natural gas" has two fundamental-
ly different meanings. In the terminolo-
gy of chemistry, 'natural gas' would
mean any gas occurring naturally, in-
cluding such gases as helium and carbon
dioxide. The common meaning of 'natu-
ral gas,' however, is a mixture of hydro-
carbons, each one having a different
chemical composition, but each one being
volatile or having a certain vapor tension.

*Cortez Pipeline Co.,* 7 FERC ¶ 61,024 at p.
61,041 (No. CP79–130 April 6, 1979) (hold-
ing by FERC that carbon dioxide is not
natural gas within the meaning of the Nat-
ural Gas Act). The Wyoming Supreme
Court has noted "that the term 'natural
gas' fairly and reasonably has more than

---

**2.** Actually, the question is whether carbon diox-
ide is "natural gas" within the meaning of the
MLA. The agency action appealed from was
taken pursuant to the MLA, not the FLPMA.
We consider the FLPMA only because of the

parallel language in the two statutes; if we were
to hold the agency action improper under the
MLA, the right-of-way could only be issued un-
der the FLPMA.

one meaning." *Amoco Prod. Co.*, 751 P.2d at 382 (holding that carbon dioxide is natural gas for purposes of a state tax statute). In the absence of more specific linguistic evidence of Congress's intention than the use of the term 'natural gas,' we cannot say on the basis of the statute's plain language that Congress has spoken directly to the question at issue.

Our conclusion that the terminology employed by Congress is ambiguous does not fully resolve the question asked by the first prong of the *Chevron* test. We must also "[e]mploy[ ] traditional tools of statutory construction" to assess whether Congress has addressed the issue. *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 446–49, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987). Legislative history is among the most frequently used of these tools. *See Salt Lake City v. Western Area Power Admin.*, 926 F.2d 974, 978–79 (10th Cir.1991). If examination of the relevant legislative history clearly revealed Congress's understanding of "natural gas," the agency and this court would be bound to apply it.

When applying the first prong of the *Chevron* test in the face of decidedly ambiguous statutory language, we approach legislative history cautiously. After all, "[l]egislative history is a step removed from the language of the statute and, hence, is not entitled to the same weight." *Miller v. C.I.R.*, 836 F.2d 1274, 1283 (10th Cir.1988). Unlike the words of the statute, which have been passed by both houses of the Congress and signed by the President, the legislative history imperfectly reflects collective judgment. It must be extremely clear if we are to view it as Congress speaking directly to the question at issue.

Applying this standard, we conclude that the legislative history of the MLA does not establish Congress's intention with the requisite clarity.[3] Indeed, one court has observed "[t]he legislative history indicates that the phrase 'for the transportation of oil or natural gas' was added to the statute solely to ensure that the statute did not

govern pipelines for water and artificial gas." *Wilderness Society v. Morton*, 479 F.2d 842, 855 n. 30 (D.C.Cir.), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). Although the statute was amended in response to the decision in the *Morton* case, that amendment did not delete the term "natural gas" and therefore does not control our understanding of it. *See Exxon Corp.*, 730 F.Supp. at 1541. The debate surrounding the adoption of the section at issue included the following suggestion by Representative Mann: "You say 'for all pipe-line purposes.' That includes not only natural gas, but artificial gas. Is it not desirable to limit this permission to oil and natural-gas pipe lines?" 51 Cong.Rec. 15419 (1914). As the district court observed, this provides powerful support for the Secretary's position. 730 F.Supp. at 1542–43. The very best approach available to Exxon is thus the one adopted in its brief: "At the time Congress enacted the MLA it probably had no specific intent about carbon dioxide." Appellant's Opening Brief at 18.

That is not the end of the question, however, for Exxon suggests that Congress meant "fuel" when it wrote "natural gas" and that, whatever else it may be, carbon dioxide is not fuel. The comments of Representative Mann, quoted above, illustrate the fragility of this premise. Even granting that Congress's primary concern when it passed section 28 of the MLA was the transportation of fuel, the exclusion of carbon dioxide rights-of-way from the statute's scope is not mandated. Moreover, that the Congressional reversal of *Morton* was motivated, in large part, by the nation's need for fuel, *see* S.Rep. No. 93–207, 93rd Cong., 1st Sess. (1973), *reprinted in* 1973 U.S.C.C.A.N. 2417, 2418, does not compel such exclusion. Even under the agency's construction, the primary concern of the MLA is fuel. Thus, Exxon's repeated references to legislative discussions of fuel are beside the point. *See* Appellant's Reply Brief at 2–4. Observing that fuel was a primary concern does not settle

---

**3.** The district court opinion in this case discusses the relevant legislative history in considerable detail. *See Exxon Corp. v. Lujan*, 730

F.Supp. 1535, 1540–45 (D.Wyo.1990). We highlight only those parts of the legislative history that influence our opinion.

the question of statutory scope. The question we must answer is whether the legislative history clearly announces that carbon dioxide is not "natural gas." We are persuaded that it does not.

■ "[W]hen an administering agency's interpretation of a statute is challenged, and traditional tools of statutory construction yield no relevant congressional intent, the reviewing court must determine if the agency's construction is a permissible one." *Salt Lake City*, 926 F.2d at 981. The agency's interpretation hinges on its definition of "natural gas." In *Chevron* itself, the Court examined the legislative history and the statutory language in order to determine reasonableness. 467 U.S. at 859–66, 104 S.Ct. at 2790–93. There are no doubt many cases in which Congress is silent as to the meaning of a particular term, but the legislative history, or the language of the rest of the statute, nonetheless renders a particular interpretation unreasonable. As the discussion above indicates, this is not such a case. In assessing reasonableness, "[t]he agency's interpretation need not be the only one it could have adopted, or the one that this court would have reached had the question initially arisen in a judicial proceeding." *Salt Lake City*, 926 F.2d at 978.

■ Exxon argues that the deferential standard of review is not appropriate in this case because the BLM has previously issued a right-of-way pursuant to the FLPMA. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Cardoza–Fonseca*, 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 (citations omitted). There is a critical difference between the inconsistency at issue in *Cardoza–Fonseca* and the

challenged action of the Secretary here. In that case, the BIA had advanced at least three different interpretations of the relevant statutory terms, and its inconsistency had extended over a number of years. *Id.* Here, the only prior decision was made by a regional office of the BLM. *See Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1350 (10th Cir.1987) (contrary decisions by regional offices do not render national policy erratic). Moreover, this case marks the first declaration of national policy by the Department of Interior's Solicitor's Office. Under these circumstances, we see no reason not to accord the agency deference.[4]

Exxon also suggests that the action of the FERC in the *Cortez Pipeline* case somehow renders the agency's decision in this case inconsistent with its past practice. In *Aulston*, we rejected a very similar argument in the following manner:

These wholly distinct interpretations of the word "gas" by agencies other than the Department of the Interior in these other contexts have no bearing on the Department's interpretation of the 1914 Act or of the related Mineral Lands Leasing Act, and do not make the Department's practice internally inconsistent.

915 F.2d at 596. Little supports the notion that this case marks the kind of conflict that erases deference. The case falls squarely within *Chevron*, and we will uphold the action if it is not unreasonable.

■ As we have noted, the use of the term "natural gas" in the MLA is ambiguous. Therefore, neither the position advanced by Exxon nor the definition adopted by the Secretary is compelled by Congress's usage. Implicit in our discussion of the relevant statutory language and the legislative history is the understanding that both definitions have some credence.

---

4. Even were we to conclude that this policy marked a change of course by the agency, we would still uphold the agency's action. The law does not require an agency to stand by its initial policy decisions in all circumstances. Instead, "an agency changing its course ... is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Here, the agency supplemented its discussion of the MLA with an examination of the legislative history of the FLPMA. *See* 97 IBLA at 54–55. The opinion of the IBLA would, in that case, provide sufficient explanation for a change in agency policy.

At most, Exxon has established "that the language may bear the interpretation [it] desire[s]—not that it cannot bear the interpretation adopted by the Secretary." *Sullivan,* 494 U.S. at 91–92, 110 S.Ct. at 966. We are not in a position, given the linguistic choices made by the Congress, to declare the Secretary's position impermissible. *See id.* at 92, 110 S.Ct. at 966.

Exxon also argues that, as policy, the decision of the Secretary is not sustainable. This argument attempts to establish that the construction is irrational and therefore not permissible. *See id.* at 89, 110 S.Ct. at 964–65. Specifically, Exxon contends that the construction of the MLA advanced by the Secretary renders the FLPMA meaningless. The IBLA apparently rejected this argument, concluding that the FLPMA is simply not addressed to the same concerns as the MLA. *Exxon Corp.,* 97 IBLA at 55. The Senate Report accompanying the FLPMA notes that: "[The FLPMA] does not provide new authority to grant rights-of-way for oil and gas pipelines as this authority is contained in [the MLA]." S.Rep. No. 94–583, 94th Cong., 1st Sess. 26. In *Aulston,* we held that the term "gas" in the MLA includes both hydrocarbon and nonhydrocarbon gases. 913 F.2d at 593–948 n. 13. "Natural gas" as used in section 28 is a subset of "gas" as used in the rest of the statute. Nothing in the FLPMA persuades us that inclusion of carbon dioxide within the MLA definition of "natural gas" eviscerates the FLPMA. The FLPMA is concerned primarily with "rights-of-way on the national resource lands for such purposes as roads, trails, canals, and powerlines." S.Rep. No. 94–583, 94th Cong., 1st Sess. 26. The Secretary's resolution of the problem presented by pipelines carrying naturally-occurring carbon dioxide gives effect to the central purposes of both statutes and is consequently permissible.

Exxon complains further that the common carrier requirement will unduly burden the carbon dioxide industry and create perverse incentives to produce artificial carbon dioxide. This strikes us as a matter more appropriately left to the agency. "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left by Congress, the challenge must fail." *Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793. Our analysis reveals that Exxon's assault on the agency's definition of "natural gas" is, in the end, just such a challenge.

The district court and the IBLA also concluded that the MLA was the appropriate authority for the right-of-way because the carbon dioxide is shipped after being separated from the rest of the gas stream and is therefore a "refined product produced therefrom" within the meaning of the statute. *See Exxon Corp.,* 730 F.Supp. at 1544–45; 97 IBLA at 62. Because we conclude that the agency interpretation of "natural gas" is sustainable, we need not reach the question whether the "refined product" language provides independent authority for the right-of-way under the MLA.[5]

We AFFIRM the decision of the district court.

---

5. The district court apparently thought it necessary to discuss the "refined product" language because it viewed the decision of the IBLA as referring to separate stages of the carbon dioxide recovery process. *Exxon Corp.,* 730 F.Supp. at 1544–45. We do not read the IBLA opinion in the same manner; instead we view the IBLA's reference to the "refined product" language as providing an alternate ground for affirming the decision of the BLM. *See Exxon Corp.,* 97 IBLA at 62. In any event, this difference of opinion has no bearing on the ultimate result. Under either approach, the decision of the Secretary to proceed under the MLA was permissible.