**ARCO OIL AND GAS COMPANY, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. 90–9545.

United States Court of Appeals, Tenth Circuit.

Dec. 23, 1993.

1432

---

John F. Shepherd of Holland & Hart, Denver, CO (Jane L. Montgomery of Holland & Hart, Denver, Colorado, and William R. Keffer of Arco Oil & Gas Co., Dallas, TX, with him on the brief), for petitioner.

Bradley S. Bridgewater, Atty., Environmental Defense Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Denver, CO (Richard B. Stewart, Asst. Atty. Gen., U.S. Dept. of Justice, Environment and Natural Resource Div., Denver, CO, Nandan Kenkeremath, Atty., Office of Gen. Counsel, U.S. E.P.A., Washington, DC, and Margaret J. Livingston, Atty., Office of Regional Counsel, U.S. E.P.A., Region VIII, Denver, CO, with him on the brief), for respondent.

Before ANDERSON, HOLLOWAY and TACHA, Circuit Judges.

HOLLOWAY, Circuit Judge.

ARCO Oil and Gas Company ("ARCO") petitions for review of a June 14, 1990 finding by the Administrator of the Environmental Protection Agency ("EPA") that EPA Region VIII properly required ARCO to obtain a Class I EPA permit pursuant to the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f to 300j–25 (1988), for operation of ARCO's Garcia # 1 injection well in Colorado. Prior to the EPA's reclassification of the well, the Garcia # 1 had been regulated as a Class II well by the Colorado Oil and Gas Conservation Commission ("COGCC"). We affirm the EPA Administrator's decision and deny ARCO's petition.

I

Since 1982, ARCO has been operating a gas extraction and processing project in Huerfano County, Colorado. The gas extracted by ARCO consists primarily of carbon dioxide (96%) and is used for enhanced oil recovery in Texas. In connection with ARCO's extraction activity, certain waste fluids are brought to the surface and subsequently disposed of in ARCO's Garcia # 1 well, an underground injection well.[1]

On April 12, 1985, the EPA Region VIII directed Arco to apply for a Class I permit for the Garcia # 1 well. I R., Doc. 4. In so doing, the agency relied on its characterization of the waste fluids disposed of in the Garcia # 1 as "hazardous," "industrial" or "municipal" waste within the meaning of 40 C.F.R. § 144.6(a)(1)–(2) (defining Class I wells). Designation of the Garcia # 1 as a Class I well would result in direct—and more burdensome—regulation of the well by the EPA rather than continued regulation by the COGCC.[2]

ARCO objected, contending that the Garcia # 1's waste fluids should instead be characterized as fluids "brought to the surface in connection with ... conventional oil or natu-

---

1. In *Phillips Petroleum Co. v. United States E.P.A.*, 803 F.2d 545, 547 n. 2 (10th Cir.1986), we explained:

Underground injection is defined by the SDWA to mean the "subsurface emplacement of fluids by well injection." Section 1421(d)(1), 42 U.S.C. § 300h(d)(1). Underground injection is a potentially widespread hazardous waste disposal practice that poses serious threats to groundwater sources of drinking water. [In enacting the SDWA,] Congress was particularly aware of the potential adverse effects of oil and gas related injection. The House Committee on Interstate and Foreign Commerce noted the "[e]nergy production companies are using injection techniques to increase production and dispose of unwanted brines brought to the surface during production.... Part C [of the SDWA] is intended to deal with all of the

foregoing situations insofar as they may endanger underground drinking water sources." H.R.Rep. No. 1185, 93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News 1974, pp. 6454, 6481.

2. The EPA does not contest ARCO's claim that compliance with Class I EPA regulations is more burdensome and expensive than compliance with the regulatory requirements of the COGCC. Petitioner's Opening Brief at 5. As ARCO points out, Class I regulations require information regarding the compatibility of injected fluids with other fluids and minerals in the injection zone (40 C.F.R. §. 146.14(b)(6)), installation and use of continuous recording devices for monitoring (§ 146.13(b)(2)), provisions for ambient monitoring and mandatory sampling of specific constituents (§ 146.13(d)), and quarterly reporting. § 146.13(c)(1).

ral gas production" within the meaning of 40 C.F.R. § 144.6(b)(1), resulting in continued Class II designation of the Garcia # 1 and regulation by the COGCC. I R., Doc. 6. ARCO's position was, and is, premised on its interpretation of the phrase "natural gas production" in § 144.6(b)(1) as broadly encompassing carbon dioxide production of the kind undertaken by ARCO in connection with its Huerfano project.

Despite its objection to the EPA's reclassification, ARCO hedged its bets and applied for a Class I permit. Four years later, EPA Region VIII issued the requested Class I permit, indicating that the designation of Garcia # 1 as a Class I well was appropriate because "the definition of 'natural gas' for the purpose of the underground injection control regulations was intended to include only 'energy-related' hydrocarbon series gases such as methane and butane," not carbon dioxide. I R., Doc. 2, Addendum at 2. This reading of the regulations was consistent with the EPA's advice to the COGCC in early 1984 that "the meaning of 'natural gas' in our regulations includes low molecular weight flammable gases and not just any naturally occurring gas." I R., Doc. 15 at 2.

In accordance with applicable administrative procedures (40 C.F.R. § 124.19), ARCO petitioned for review to the EPA Administrator. I R., Doc. 1. The Administrator denied ARCO's petition, concluding ARCO did not demonstrate "that the Region's permit determination [was] either clearly erroneous (legally or factually) or that it involve[d] an important question of policy or exercise of discretion warranting review." Petitioner's Opening Brief, Attach. A.

In its petition to this court, ARCO requests that we set aside the EPA's construction of the SDWA and its regulations. In the alternative, if the EPA's construction is upheld and the reclassification of the Garcia # 1 as a Class I well is affirmed, ARCO urges us to invalidate the reclassification pursuant to the Administrative Procedures Act as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706. According to ARCO, "there is no rational basis for regulating the disposal of produced water from carbon dioxide operations more stringently than the disposal of produced water from hydrocarbon operations." Petitioner's Opening Brief at 20–21.

Our jurisdiction is based on 42 U.S.C. § 300j–7(a)(2).

## II

Here, as in *Exxon Corp. v. Lujan*, 970 F.2d 757, 759 (10th Cir.1992), and *Aulston v. United States*, 915 F.2d 584, 588–89 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991), we review the EPA's administrative findings under the deferential test established in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is whether *Congress has directly spoken* to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a *permissible construction of the statute.*

*Id.* at 842–43, 104 S.Ct. at 2781–82 (emphasis added; footnotes omitted). *Accord Sullivan v. Everhart*, 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990); *Rives v. ICC*, 934 F.2d 1171, 1174 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992). The standard of review is the same whether the agency interpretation is performed through rulemaking or, as here, informal adjudication. *See Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1496 (D.C.Cir.1988).

## III

### A

We first address whether the EPA properly characterized waste fluids disposed of in ARCO's Garcia # 1 injection well as "hazardous," "industrial" or "municipal" waste within the meaning of 40 C.F.R. § 144.6(a)(1)–(2), or whether the waste fluids should have been characterized as fluids "brought to the surface in connection with ... conventional oil or natural gas production" under § 144.-6(b)(1).

The initial step in our analysis is to determine "whether Congress has directly spoken to the precise question at issue," *i.e.*, whether Congress itself has defined the term "natural gas" in the context of the SDWA and its regulations. *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781; *accord Good Samaritan Hospital v. Shalala*, ──── U.S. ────, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368 (1993) ("[t]he starting·point in interpreting a statute is its language"). In so doing, we must consider the language of the relevant statutory scheme as illuminated by "the provisions of the whole law, and ... its object and policy." *Aulston*, 915 F.2d at 589. *See also Sullivan v. Everhart*, 494 U.S. 83, 89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (" '[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole' ") (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)).

### 1

█ The SDWA makes reference to "natural gas" in two sections, neither of which provides any clear insight into the intended meaning of that term. First, concerning underground injection of fluids brought to the surface in connection with oil and natural gas production, § 300h(b)(2) of the statute provides:

Regulations of the Administrator under this section for State underground injection control programs may not prescribe requirements which interfere with or impede—

(A) the underground injection of brine or other fluids which are brought to the surface in connection with oil or *natural gas* production or *natural gas* storage operations, or

(B) any underground injection for the secondary or tertiary recovery of oil or *natural gas*, ·

unless such requirements are essential to assure that underground sources of drinking water will not be endangered by such injection.

(Emphasis added.) Second, with respect to the kinds of underground injection covered by the SDWA, § 300h(d)(1) of the statute (a 1980 amendment) excludes injection of "*natural gas* for purposes of storage." (Emphasis added.) [3]

Apart from simply employing the term "natural gas," the SDWA does not elaborate on the term's intended meaning or scope. As we recognized in *Exxon*, "[i]n the absence of more specific linguistic evidence of Congress's intention than the [mere] use of the term 'natural gas,' we cannot say on the basis of the statute's plain language that Congress has spoken directly to the question at issue." 970 F.2d at 761. Accordingly, in order to discern the intended meaning of the term used, we consult relevant secondary authorities, a task we previously undertook in both *Exxon*, 970 F.2d at 760–61, and *Aulston*, 915 F.2d at 589–90. However, because our definitional inquiry in this case is the same as in *Exxon* and *Aulston*, we need not repeat the analysis here. Suffice it to say, we are not aware of any post-*Exxon* authorities that in any way alter or affect our previous conclusions. Accordingly, we conclude, once again, that "the term 'natural gas' is ambiguous" and " 'fairly and reasonably has more than one meaning.' " *Exxon*, 970 F.2d at 760–61

---

**3.** It is pursuant·to the foregoing statutory provisions that the EPA has promulgated specific regulations classifying various types of injection wells, including "industrial and municipal disposal wells" (Class I wells) and wells which inject fluids "brought to the surface in connection with ... conventional oil or natural gas production" (Class II wells). 40 C.F.R. § 144.-6(a)–(b).

(citation omitted); *Aulston,* 915 F.2d at 589 ("[t]he operative word 'gas' has numerous meanings in common speech, in the natural sciences, and in various legal and industrial contexts").

Under the first prong of *Chevron,* then, the only remaining question is whether the legislative history reveals Congress' intent concerning the meaning and scope of the term "natural gas." Only if the legislative history is "extremely clear" in this regard is it determinative on the issue. *Exxon,* 970 F.2d at 761.

The legislative history of the SDWA sheds precious little light on the intended meaning and scope of the term "natural gas" as used therein.[4] ARCO attributes great significance to the fact that the House Report accompanying the statute reveals a congressional intent to limit "constraints on energy production activities." H.R.Rep. No. 1185, 93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News at 6484. Inasmuch as the carbon dioxide extracted by ARCO in connection with its Huerfano operation is used for enhanced oil recovery in Texas, ARCO portrays the operation—including that of the Garcia # 1—as a favored "energy production activit[y]" encompassed by the House Report. However, the report simply does not reveal whether Congress considered production of carbon dioxide one of the "energy production activities" to be protected, much less whether

Congress viewed carbon dioxide as falling within the definition of "natural gas."[5]

Moreover, to the extent the report reflects a concern about excessive regulation of the oil and gas industry in general, it expressly subjects this concern to the overriding goal of protecting the quality of drinking water. Specifically, the report states that constraints which "could stop or substantially delay production of oil or natural gas" should be "as limited in scope as possible *while still assuring the safety of present and potential sources of drinking water.*" *Id.* (emphasis added). As we observed in *Phillips Petroleum Co.:*

> If a requirement "is essential to assure that underground sources of drinking water will not be endangered," then it is of no import whether underground injections are impeded. [42 U.S.C. § 300h–1(c).] Indeed, the clear overriding concern of Congress was that of "assuring the safety of present and potential sources of drinking water." (H.R.Report No. 1185, 93d Cong., 2d Sess. at 31, U.S.Code Cong. & Admin.News 1974 p. 6484).... [T]he phrase " 'underground injection which endangers drinking water sources' is to be liberally construed so as to effectuate the preventative and public health protective purposes of the [SDWA]." [*Id.*]

*Id.* at 560.

Because Congress' concern about undue interference with oil and gas production is

---

4. We note that both ARCO and the EPA have cited various portions of the legislative history post-dating the enactment of the SDWA in 1974. Petitioner's Opening Brief at 14–16; Brief for Respondent at 19–20. The cited excerpts do not demonstrate with any clarity Congress' intent concerning the meaning and scope of the term "natural gas." Moreover, such post-enactment legislative history carries little weight in our effort to ascertain Congress' original intent and we therefore need not, and do not, rely thereon in resolving the issue at hand. *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of·an earlier one").

5. The cited portion of House Report 1185 explains the purpose behind 42 U.S.C. section 300h(b)(2) as being to curtail nonessential regulations "interfer[ing] with or imped[ing] ... underground injection of ... fluids which are brought to the surface in connection with oil or

natural gas production." In relevant part, the Report states:

> The Committee's intent in adopting this amendment was not to require EPA to bear an impossible burden of proof as a condition of promulgation of any such regulation. Rather, the Committee sought to assure that constraints on energy production activities would be kept as limited in scope as possible while still assuring the safety of present and potential sources of drinking water.
>
> \* \* \* \* \* \*
>
> Moreover, in using the words "interfere with or impede" the Committee did not intend to include every regulatory requirement which would necessitate the expenditure of time, money, or effort. Rather, the Committee intended to refer to those requirements which could stop or substantially delay production of oil or natural gas.

H.R.Rep. No. 1185, 93d Cong., 2d Sess. 29 (1974), U.S.Code Cong. & Admin.News at 6484.

secondary and expressly subject to the primary goal of ensuring clean water, the legislative history cited by ARCO in no way mandates that we override the EPA and adopt the broad construction of the term "natural gas" urged by ARCO.[6] Instead, we conclude that neither the language of the SDWA, nor the relevant legislative history reveals a clear congressional intent to treat carbon dioxide as "natural gas" within the meaning of the Act.

### 2

■ We next consider whether the EPA's narrow interpretation of the term "natural gas" is "a permissible construction of the [SDWA]" (*Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82), *i.e.*, whether the construction is "'rational and consistent with the statute.'" *Sullivan*, 494 U.S. at 89, 110 S.Ct. at 964 (quoting *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 123, 108 S.Ct. 413, 416, 98 L.Ed.2d 429 (1987)). *Accord Salt Lake City v. Western Area Power Admin.*, 926 F.2d 974, 981 (10th Cir.1991) ("when an administering agency's interpretation of a statute is challenged, and traditional tools of statutory construction yield no relevant congressional intent, the reviewing court must determine if the agency's construction is a permissible one"); *Aulston*, 915 F.2d at 597 ("we will defer to the [EPA's] interpretation unless it is inconsistent with the purpose and policy of the [statute]"). As recently reiterated by the Supreme Court:

> Confronted with an ambiguous statutory provision, we generally will defer to a permissible interpretation espoused by the agency entrusted with its implementation. ... Of particular relevance is the agency's contemporaneous construction which "we have allowed ... to carry the day against doubts that might exist from a reading of the bare words of a statute." *FHA v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958).

*Good Samaritan Hospital,* —— U.S. at ——, 113 S.Ct. at 2159.

This is not the first time we have been asked to consider the propriety of EPA interpretations of the SDWA. In *Phillips Petroleum Co.*, we considered whether the EPA properly invoked the SDWA to make regulations applicable to Indian lands. We defined the relevant standard of review as follows:

> Because Congress has conferred ... sweeping authority on the [EPA] Administrator, courts afford considerable deference to the EPA's construction of the statutory scheme that it is entrusted to administer. ... We need not find that the EPA's interpretation is the only permissible construction but only that the EPA's understanding of the statute is a sufficiently rational one to preclude a court from substituting its judgment for that of the EPA. ... "The need for judicial restraint is further heightened by the realization that courts do not share the [Administrator's] expertise in this highly technical area." [*American Mining Congress v. Marshall*, 671 F.2d 1251, 1255 (10th Cir. 1982).]

*Phillips Petroleum Co.*, 803 F.2d at 558 (citations omitted).

Affording the appropriate measure of deference to the EPA and recognizing the Administrator's technical expertise in this area, we find the agency's interpretation of "natural gas" as excluding carbon dioxide to be permissible and consistent with the purpose and policy of the SDWA. The overriding purpose of the Act is "to insure the quality of publicly supplied water" by "regulat[ing] the endangerment of underground drinking water sources." *Id.* at 547. Here, the EPA's narrow interpretation of the term "natural gas" has the effect of subjecting carbon dioxide injection wells to stricter regulatory scrutiny and placing a greater number of wells under direct EPA oversight. This result is consistent with the statutory goal of treating water pollution as "a national concern," the

---

**6.** We likewise decline ARCO's invitation to read substantive significance into the varying use of the terms "gas," "natural gas," and "hydrocarbons" within the SDWA and its legislative history and regulations. Petitioner's Opening Brief at 11–12, 18–20. Not only do traditional rules of statutory construction advise against our doing so (*Aulston*, 915 F.2d at 590–91), but the drafters' choice of terminology simply does not provide the kind of "extremely clear" guidance necessary to resolve questions of legislative intent. *Exxon*, 970 F.2d at 761.

causes and effects of which are "national in scope" and which therefore require "national standards for protection of public health." *Id.* at 555 (quoting H.R.Rep. No. 1185, 93d Cong., 2d Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 6454). Because "Congress emphasizes a national policy of clean water[ ] [s]o, therefore, must we in interpreting the statute." *Id.* Accordingly, we are compelled to conclude that the EPA's interpretation of "natural gas" in the context of the SDWA "gives effect to the central purposes of [the] statute[ ] and is consequently permissible." *Exxon,* 970 F.2d at 763. "We should be especially reluctant to reject the agency's current view which, as we see it, so closely fits 'the design of the statute as a whole and ... its object and policy.'" *Good Samaritan Hospital,* — U.S. at —, 113 S.Ct. at 2161 (quoting *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)).[7]

**B**

■ Lastly, we address ARCO's alternative contention that regulation of the Garcia # 1 as a Class I well is arbitrary and capricious and therefore in violation of the Administrative Procedure Act, 5 U.S.C. § 706. ARCO says the produced waters from its Sheep Mountain wells are "virtually identical" to waters from wells producing mainly hydrocarbon gases; equipment and production methods for those Sheep Mountain wells are "virtually identical" to equipment and production methods for wells producing mainly hydrocarbon gases; ARCO injects the largely carbon dioxide gas stream from the field into old oil wells to enhance oil recovery; and Congress intended to limit as much as possible regulatory constraints on the oil and gas industry. Thus, ARCO concludes it is arbitrary and capricious to impose Class I regulation on the Garcia # 1 well.

We are not persuaded. A very similar argument was discussed in *Exxon,* 970 F.2d at 763, where Exxon argued that the common

carrier requirement emanating from the Secretary's ruling would "unduly burden the carbon dioxide industry and create perverse incentives to produce artificial carbon dioxide." We disagreed, holding that Exxon's argument struck us as a matter more appropriately addressed to the agency, and that the challenge really centered on the wisdom of the agency's policy, rather than on whether it was a reasonable choice within a gap left by Congress. *Id.* Here we have already upheld the administrative interpretation that carbon dioxide is not "natural gas" within the meaning of 40 C.F.R. § 144.6(b)(1) as proper. This essentially disposes of ARCO's contention on arbitrariness.

It is true that the APA provisions in 5 U.S.C. § 706 have disjunctive protections against actions that are arbitrary, capricious or an abuse of discretion. Perhaps an individual ruling could run afoul of those restrictions and thus be invalid in some special case, but we see no showing of such a violation here. As we have noted:

> The arbitrary and capricious standard of review ... applies to informal rule-making proceedings such as those provided in the SDWA. [Citation.] The United States Supreme Court has explained the arbitrary and capricious standard as follows:
>
>> To make this finding the court must consider *whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.* Although this inquiry into the facts is to be searching and careful, the ultimate standard is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
>
> *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted).

*Phillips Petroleum Co.,* 803 F.2d at 558 (emphasis added).

---

7. The fact that other federal agencies have adopted contrary definitions of the term "natural gas" in different statutory contexts (*see* generally *Exxon,* 970 F.2d 757; *Aulston,* 915 F.2d 584) is not persuasive here. It is well-settled that divergent interpretations of "temporally and factually

distinct statutes ... administered by different agencies"—including interpretations of the term "gas"—"have no bearing on the Department's interpretation of [a different statute], and do not make the Department's practice internally inconsistent." *Aulston,* 915 F.2d at 596.

The complaints made by ARCO do not warrant a holding that the EPA's decision to regulate the Garcia # 1 as a Class I well was arrived at without a "consideration of the relevant facts," nor does the agency's decision reveal a "clear error of judgment" on the part of the EPA.

Accordingly, because we are "not empowered to substitute [our] judgment for that of the agency" (*id.*), we decline to second-guess the EPA's decision to regulate the disposal of carbon dioxide waste fluids—including underground injection by the Garcia # 1—more stringently than the disposal of hydrocarbon waste fluids. Insofar as ARCO's challenge to the merits of the EPA's administrative decision "really centers on the wisdom of the agency's policy," the challenge "must fail." *Chevron,* 467 U.S. at 866.

For the foregoing reasons, ARCO's petition for review is **DENIED.**