**THE EXCHANGE BANK, Plaintiff,**

v.

**THE DIRECTOR OF THE OFFICE OF THRIFT SUPERVISION, Defendant,**

**American Bank of Oklahoma, Collinsville, Oklahoma, a federally chartered stock saving bank, Intervenor/Defendant.**

No. 98–CV–241–C(J).

United States District Court, N.D. Oklahoma.

Nov. 23, 1998.

Steven Matthew Kobos, Nichols Wolfe Stamper Nally & Fallis Inc., Tulsa, OK, for The Exchange Bank, plaintiffs.

Thomas J. Segal, Aaron B. Kahn, Office of Thrift Supervision, Litigation Division, Washington, DC, for Office of Thrift Supervision, defendants.

Jody Rae Nathan, Robert A. Franden, Feldman Franden Woodward & Farris, Tulsa, OK, for American Bank of Oklahoma, Collinsville, Oklahoma, intervenor defendant.

### ORDER

H. DALE COOK, Senior District Judge.

Pending before the Court are the motions for summary judgment filed by plaintiff, Exchange Bank ("Exchange"), defendant, Office of Thrift Supervision ("OTS"), and intervenor/defendant, American Bank of Oklahoma.

The material facts in this case are not disputed. In June 1997, a group of individuals ("organizers") applied to the OTS for permission to organize a federal savings association under the name of American Bank of Oklahoma ("American"). The organizers sought to establish American's home office in Collinsville, Oklahoma, with a branch office in Skiatook, Oklahoma. Exchange and Bank of the Lakes of Collinsville filed a protest against the application and requested a hearing. Specifically, Exchange opposed the or-

ganizers' request to open a branch office in Skiatook.[1] Exchange's principal argument before the OTS was that the Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901 *et seq.*, and the OTS's regulations implementing that Act prohibit the approval of a branch application prior to the applicant establishing a record of helping to meet the credit needs of the community. Thus, since American had never conducted business and, therefore, had no record of community reinvestment, Exchange maintained that the OTS could not approve the organizers' application to establish the Skiatook branch office. Exchange essentially argued for a per se rule prohibiting the contemporaneous establishment of a savings association and a branch office.

The OTS held a hearing in October 1997, in Dallas, Texas, at which Exchange was permitted to present its argument against the application. In February 1998, the OTS issued an order approving the organizers' application and granting a charter to American. The order also authorized American to open a branch office in Skiatook. In March 1998, Exchange requested the OTS to stay the portion of its order permitting American to establish the Skiatook branch office. Exchange's request was denied, and this action followed.

On March 27, 1998, Exchange filed the present action challenging the OTS's order authorizing American to open its Skiatook branch office. Along with its complaint, Exchange filed a motion to stay the OTS's order pending judicial review of the agency action. This Court denied Exchange's motion for stay on May 19, 1998.

### Standard of Review

In considering a motion for summary judgment, the Court "has no real discretion in determining whether to grant summary judgment." *U.S. v. Gammache,* 713 F.2d 588, 594 (10th Cir.1983). The Court must view the pleadings and documentary evidence in the light most favorable to the nonmovant, *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 527–28 (10th Cir.1994), and summary judgment is only appropriate "if the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Akin v. Ashland Chemical Co.,* 156 F.3d 1030, 1034 (10th Cir.1998). Further, "'the moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment.'" *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991) (quoting *Ewing v. Amoco Oil Co.,* 823 F.2d 1432, 1437 (10th Cir.1987)). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The "party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

### Discussion

Prior to addressing the merits of this action, the Court must determine whether Exchange has standing to challenge the OTS's order in this Court.[2] The OTS argues that Exchange lacks Article III standing as well as prudential standing. Conversely, Exchange contends that it does have standing to contest the OTS's order due to the injury it will suffer if American is permitted to compete with Exchange in Skiatook. Exchange further submits that it "has an interest in assuring that competitor institutions are not allowed to avoid their CRA requirements."

It is well-settled that the party seeking to invoke the authority of the Court bears the burden of establishing standing. *See Loving v. Boren,* 133 F.3d 771, 772 (10th Cir.1998) (the elements of standing are an indispensable part of plaintiff's case, upon

---

1. The substance of Exchange's protest is that it will suffer injury from being forced to compete with American in Skiatook.

2. The OTS raises the issue of standing in its motion for summary judgment.

which he bears burden of proof). In its response to the OTS's argument that it lacks standing to challenge the order at issue, Exchange contends that this argument "is contrary to the OTS's earlier position with respect to Exchange Bank's protest. The OTS in examining Exchange Bank's protest determined that Exchange Bank's protests met the regulatory criteria to be deemed 'substantial' and accordingly allowed oral argument." Thus, Exchange appears to argue that since the OTS permitted it to protest the application before the agency, Exchange necessarily has standing to contest the OTS's order here. Mere participation in the administrative process, however, does not confer standing to bring an action in federal court. *City of Orrville, Ohio v. Federal Energy Regulatory Comm.,* 147 F.3d 979, 985 (D.C.Cir.1998). *See also Inner City Press v. Board of Governors of the Fed. Reserve,* 130 F.3d 1088, 1089 (D.C.Cir.1997) (participation in administrative proceedings does not, without more, satisfy a petitioner's Article III injury-in-fact requirement); *Lee v. Board of Governors of the Fed. Reserve,* 118 F.3d 905, 911(2d Cir.1997) (same).

■ Hence, Exchange is required, under Article III of the Constitution, to demonstrate injury resulting from the OTS order at issue. The Supreme Court has recently reiterated the "irreducible constitutional minimum" of standing, which requires Exchange to show:

> (1) that [it has] suffered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1163, 137 L.Ed.2d 281 (1997).

■ It appears that Exchange has satisfied the first and second elements of standing. The fact that Exchange will face certain competition from American's branch office, and that this will result in decreased deposits and profits to Exchange, may be properly characterized as an injury-in-fact. And, this injury was caused by the OTS's order approving American's application to open the Skiatook branch office. However, the third element of standing is more problematic since the Court has determined, for the reasons below, that summary judgment should be entered in favor of defendants. Nevertheless, it appears that Exchange's action, at the time it was filed, raised a genuine, debatable legal dispute and that redressibility by a favorable decision was not so remote or speculative as to deprive Exchange of Article III standing. Accordingly, the Court concludes that Exchange has met its burden of establishing standing under Article III of the Constitution.

■ The Court's inquiry into standing, however, does not end with a determination under Article III. In its complaint, Exchange states that "This Court has jurisdiction of this action under 28 U.S.C. § 1331 to review a final agency action of the OTS in accordance with the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*" Section 702 of the APA provides that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . , is entitled to judicial review thereof." In interpreting § 702, the Supreme Court has consistently imposed a prudential standing requirement in addition to the constitutional injury-in-fact requirement. *NCUA v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998). "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" *Id.* (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Citing *NCUA,* Exchange argues that its present complaint is within the zone of interest to be protected by the CRA and its regulations since it "has an interest in assuring that OTS does not improperly relieve a competitor savings association of it obligations under the CRA." The Court does not agree.

■ In determining whether a particular plaintiff's interest is arguably within the zone of interests to be protected by a statute, it is true that the Court should not inquire into whether there has been a congressional intent to benefit the plaintiff. *Id.* 118 S.Ct. at 933. Rather, even if a particular plaintiff is, in essence, an unintended beneficiary of a statute, he nevertheless has prudential standing if he can meet the zone of interests test. However, the test denies a right of review if the plaintiff's interests are only marginally related to or inconsistent with the purposes of the relevant statute. *Id.* at 934. Accordingly, the Court is to "first discern the interests 'arguably ... to be protected' by the statutory provision at issue; [the Court must] then inquire whether the plaintiff's interests affected by the agency action in question are among them." *Id.* at 935.

■ The purpose of the CRA is clear. The statute provides that:

(a) The Congress finds that—

(1) regulated financial institutions are required by law to demonstrate that their deposit facilities serve the convenience and needs of the communities in which they are chartered to do business;

(2) the convenience and needs of communities include the need for credit services as well as deposit services; and

(3) regulated financial institutions have continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered.

(b) It is the purpose of this chapter to require each appropriate Federal financial supervisory agency to use its authority when examining financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound operation of such institutions.

12 U.S.C. § 2901. The Court thus agrees with the OTS that the CRA was clearly intended to encourage federally regulated financial institutions to "help meet the credit needs of the local communities in which they are chartered."

It has also been noted that the "CRA is an amorphous statute.... Its pronouncement ... is not a directive to undertake any par-

ticular program or to provide credit to any particular individual. The statute, rather, is precatory." *Lee*, 118 F.3d at 913. Further, the CRA does not create a private right of action to enforce its terms, and it "sets no standards for the evaluation of a bank's contribution to the needs of the community." *Id.* Rather, the purpose of the CRA is simply "to encourage more coordinated efforts between private investment and federal grants and insurance in order to increase the viability of our urban communities." *Id.* (quoting H.R. Conf. Rep. No. 95–634, at 76). It is therefore clear that Congress, in enacting the CRA, intended for the statute to benefit the citizens of urban areas, typically the inner cities, which have historically suffered from a lack of community reinvestment by local financial institutions. The Court further agrees with the OTS that the CRA was designed to increase, not thwart, competition for previously underserved customers, and provide them with more, not less, access to credit. Accordingly, the interests arguably to be protected by the CRA are the interests of increasing access to credit by persons within urban areas, for the purpose of revitalizing such areas.

In contrast to the stated intentions of the CRA, Exchange's interest in bringing this lawsuit is to limit banking competition within the Skiatook community. The Court finds that this interest is inconsistent with the purposes of the CRA, as outlined above. Hence, it appears that Exchange cannot meet the zone of interests test since that test denies a right of review where a plaintiff's interests are inconsistent with the purposes of the statute in question. *NCUA,* 118 S.Ct. at 934. Of course, Exchange does not claim such a limited interest in bringing this action; rather, Exchange argues that since it must comply with the CRA requirements, it has an interest in assuring that the OTS does not improperly relieve a competitor of its CRA obligations. Relying on *NCUA,* Exchange maintains that the cases support its position that competitor banks have an interest in challenging agency action which relaxes statutory restrictions on other competitors. The Court finds this reading of the cited cases too broad.

In *NCUA* and the cases cited therein, the relevant statutes served to limit the markets that certain financial institutions could serve. For example, in *NCUA,* the Supreme Court noted that the Federal Credit Union Act ("FCUA"), 12 U.S.C. § 1759, provides that "federal credit union membership shall be limited to groups having a common bond of occupation or association, or to groups within a well-defined neighborhood, community, or rural district." The Supreme Court found that one of the interests arguably to be protected by the FCUA is an interest in limiting the markets that credit unions can serve. *NCUA,* 118 S.Ct: at 935. The Supreme Court, in concluding that the plaintiff banks had prudential standing to bring an action against the National Credit Union Administration, held that, regardless of any intention of Congress to benefit banks, the banks' interest in limiting the markets that credit unions can serve is arguably within the zone of interests to be protected by the statute. *Id.* at 938. Since the interest of the banks in limiting competition in its markets comported with the interest of the FCUA in limiting the markets credit unions can serve, the banks satisfied the zone of interests test. Similarly, in cases cited in *NCUA,* the Supreme Court held that, although Congress did not specifically intend to benefit travel agents and data processors by enacting the National Bank Act and the Bank Service Corporation Act, one of the interests arguably to be protected by these statutes "was an interest in preventing national banks from entering other businesses' product markets. As competitors of national banks, travel agents and data processors had that interest, and that interest had been affected by the [agency's] interpretations opening their markets to national banks." *NCUA,* 118 S.Ct. at 936 (citing *Data Processing,* supra; *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970)).

Hence, in all of these cases, there is one common theme—the statute at issue served to limit ,or restrict the market which the competitor-defendants could serve. As such, the competitor-plaintiffs in markets affected by the agency's action had prudential standing, based on their like interest of limiting competition in their particular market, to challenge the agency decision permitting the competitor-defendants to enter their markets. Here, however, the CRA expresses no interest in limiting competition in any market, and this, in fact, is contrary to the very purpose of the Act. Thus, Exchange's interest in limiting competition in its Skiatook market is not within the CRA's zone of interests. Further, the CRA expresses no interest in permitting one financial institution to bring an action to enforce the CRA's regulations for the purpose of limiting or excluding competition. Accordingly, the Court concludes that Exchange lacks prudential standing. However, even assuming that Exchange has standing to challenge the OTS's order, its claims are meritless.

 "Where an agency purports to act pursuant to an interpretation of its own regulations, the court should generally undertake a two-step review of the government's action to determine whether it was statutorily authorized." *Mission Group Kansas, Inc. v. Riley,* 146 F.3d 775, 780 (10th Cir.1998). Provided the "agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Id.* (quoting *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993)). An agency's interpretation of its own regulations is subject to challenge for being arbitrary, capricious, or an abuse of discretion. *Id.* at n. 3. If the agency's interpretation of its regulations survives this review, the Court then analyzes the regulations as interpreted under the familiar framework established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Id.* at 780–81. "The standard of review is the same whether the agency interpretation is performed through rulemaking or, as here, informal adjudication." *Arco Oil and Gas Co. v. EPA,* 14 F.3d 1431, 1433 (10th Cir. 1993). And, the Court agrees with Exchange that "an agency's failure to follow its own regulations is challengeable under the APA." *McAlpine v. United States,* 112 F.3d 1429, 1434 (10th Cir.1997).

 Here, the OTS concluded that its regulations do not require that a savings

association actually have a history of operations before opening a branch. Rather, the OTS concluded that the regulatory criteria can be satisfied based on the policies set forth in American's business plan. That is, the OTS concluded that its regulations do not prohibit the opening of a branch office contemporaneously with organizing a savings association. The OTS contends that the regulations only require that the OTS consider an institution's efforts to comply with the CRA's stated goals when considering a branch office application. Further, the OTS argues that even if it finds that an institution's record of meeting the credit needs of the community is deficient, it is not thereby required to deny an application to open a branch office. Instead, this is simply a factor to be taken into consideration when analyzing a branch office application. In the present case, the OTS maintains that it did consider American's CRA record, which demonstrated that American had not made any loans. Therefore, the OTS found that American could not demonstrate that it had met the credit needs of the community. However, the OTS concluded that where an institution could not have previously complied with the goals of the CRA because the institution did not exist, it is sufficient under the regulation to look to its plan for future compliance. Conversely, Exchange argues that the regulations make clear that the OTS cannot approve a branch application at the same time it approves the organization of a savings association since the institution cannot demonstrate that it has met the credit needs of the community.

The Court agrees with the interpretation articulated by the OTS. Pursuant to its regulations, in considering whether to approve a branch application, "the OTS will assess and take into account an association's record of helping to meet the credit needs of its entire community, including low- and moderate-income neighborhoods, pursuant to part 563e of this chapter." 12 C.F.R. § 545.92(e)(1). The regulation goes on to provide that "assessment of an association's record of performance may be the basis for denying an application." *Id.* (emphasis added). Thus, while the regulation, at first blush, appears to require an institution to produce a record of community assistance when submitting a branch application, the Court agrees with the

OTS that this is not, in fact, required. Rather, the regulation simply mandates that the OTS take into account an association's CRA record when considering a branch application; it does not foreclose consideration of the application if no record exists. Similarly, 12 C.F.R. § 563e.29(a) provides that, "Among other factors, the OTS takes into account the record of performance under the CRA of each applicant savings association ... in considering an application for: (1) The establishment of a domestic branch or other facility that would be authorized to take deposits." The regulation goes on to provide that "A savings association's record of performance may be the basis for denying or conditioning approval of an application listed in paragraph (a) of this section." 12 C.F.R. § 563e.29(d). Again, the regulation requires that the OTS consider an institution's CRA record, if one exists, when considering a branch application, but it does not, by its terms, prohibit the granting of a branch application if no CRA record exists. The provisions contained in 12 C.F.R. § 556.5(c)(1) and (3) result in the same conclusion.

Hence, the Court finds that the OTS's interpretation of its own regulations is not plainly erroneous or inconsistent with those regulations, and its interpretation is not arbitrary, capricious, or an abuse of discretion. The Court therefore adopts the OTS's interpretation. The Court also finds and concludes that the OTS's interpretation of its regulations does not violate *Chevron,* supra. First, Congress has not directly spoken to the precise issue in the CRA. There is no indication in the CRA that an institution must produce a record of community reinvestment prior to being permitted to open a branch office. Second, the Court finds that the OTS's interpretation of the CRA is reasonable.

Accordingly, Exchange's motion for summary judgment is hereby DENIED. The OTS's and American's motions for summary judgment are hereby GRANTED.